## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TARECK WILLIAMS, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. _____ |
| v. | **CLASS ACTION COMPLAINT** |
| PIPELINERS LOCAL 798 OF THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO, | **JURY TRIAL DEMANDED** |
| MICHELS PIPELINE, INC., | |
| and | |
| MICHEL'S CORPORATION, | |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Tareck Williams (a/k/a Tareck Jordan) ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as more fully defined below), bring this Class Action Complaint against Defendants Pipeliners Local 798 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO ("Local 798"), Michels Pipeline, Inc., and Michel's Corporation (Michels Pipeline, Inc. and Michels Corporation are referred to collectively herein as "Michel's") (all three Defendants are, collectively, "Defendants"), arising out of

Defendants' uniform pattern and practice of race discrimination against Plaintiff and the other Class members, including disparate treatment discrimination, disparate impact discrimination, hostile work environment harassment, and retaliation.  Plaintiff makes the following allegations upon personal knowledge as to his own acts, and upon information and belief and his attorneys' investigation as to all other matters, alleging as follows:

## I.   <u>NATURE OF THE ACTION</u>

1.     Plaintiff brings his claims individually, and on behalf of a Class of similarly situated present and former Black members of Local 798 who worked at Michel's at any time between the date four years prior to the date of filing of this Complaint and the date of judgment, seeking damages and other relief resulting from Defendants' discriminatory practices, which deprived Plaintiff and the other Class members of the benefits of their employment to which they are legally entitled.

2.

## II.   <u>PARTIES</u>

**A.**   *Plaintiff*

3.     Plaintiff is a Black man and a resident of Easton, Pennsylvania, and citizen of Pennsylvania. Mr. Williams has been a member of Defendant Local 798 since in or around April of 2017. Plaintiff was an employee of Michel's since April 28,2023.

4.     Plaintiff began to experience discrimination as a Member of Local 798 from the first days of his membership and first job assignment.

**B.**     *Defendants*

       ***i.*** Local 798

5.      Local 798, which is headquartered in Tulsa, Oklahoma, is a member organization of the United Association of Journeyman and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO.

6.      Local 798 is an unincorporated association of participating employees which deals with employers, including through collective bargaining, concerning terms and conditions of employment.

7.      Local 798 is a labor organization engaged in an industry affecting commerce.

8.      According to its website, Local 798 is a trade union that provides the highest quality of pipeline Welders to contractors across the country.  Local 798 represents individuals with a high skill level who weld together the various sections of oil and gas pipelines.  In addition to the nearly 3,100 skilled Welders that are a part of Local 798, it also represents more than 650 Journeymen Spacers who assist in lining up the pipe and completing the hydrostatic testing of the pipeline and over 3,200 Helpers who assist the Welders in the weld completion process. These tasks are critical to the integrity of the pipeline and the safety surrounding the project.

       ***ii.*** Michel's

9.      Michel's Corporation, which is headquartered in Brownsville, Wisconsin, is a for-profit Corporation.  Its annual revenue was approximately $2.9 billion in 2022.

10.      Michels Pipeline, Inc. is a division of Michel's Corporation and is contractor providing pipeline and compressor station construction for the nation's evolving energy

and transitional energy.  It claims that it provides the safest, most reliable solutions for evolving energy and infrastructure needs. Michel's Pipeline, Inc. operates a worksite location in Wilkes-Barr, Pennsylvania (the "worksite"), where Plaintiff worked, and also operates other worksites around the country.

11.     Michel's hires union journeyman welders and helpers, through Local 798, who work at the worksite and other Michel's locations around the country.

12.     Michel's is a primary employer of Local 798 members throughout the United States.

### III.     JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over Defendant Local 798 because Local 798 transacts business in this District.

14.     This Court has personal jurisdiction over Defendant Michel's because Michel's transacts business in this District.

15.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, namely Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*., as amended ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3), in that the conduct giving rise to the claims herein occurred within this District and Division, and the unlawful employment practices alleged herein have been committed in this District and Division.

## IV.   **EXHAUSTION OF REMEDIES**

17.     Plaintiff exhausted his administrative remedies as to his Title VII claims against Local 798, on behalf of himself and all Class members, by timely filing a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and timely filing suit following receipt of a Notice of Right to Sue.1  A copy of Plaintiff's Notice of Rights is attached hereto as Exhibit 1.

## V.   **FACTUAL ALLEGATIONS**

A. *History of Race Discrimination By Local 798*

18.     For the first 40 years of its existence, until the mid-1980s, Local 798 had no Black members, pursuant to an explicit, exclusionary policy.  Local 798's membership was exclusively White men.

19.     For decades following Local 798's formation in 1949, there was an unwritten practice that if a business agent or welder foreman hired a black person for work on the pipeline, that agent or foreman would be fired.

20.     In light of this racist history, in the mid-1980s, the EEOC sued Local 798 for violations of Title VII.  In a reported opinion, the U.S. District Court for the Northern District of Oklahoma opined that Local 798 had engaged in intentional discrimination resulting in disparate treatment of Black people and that its policies and practices resulted in a disparate impact on Black people.  *See* 646 F. Supp. 318 (N.D. Okla. 1986).

---

[1] Plaintiff intends to file a charge of discrimination against Michel's and seek leave to amend his pleading to add additional claims under Title VII claims against Michel's when the administrative exhaustion process is completed.

21.     Unfortunately, this ruling did not cause Local 798 to stop discriminating against its Black members.  It merely caused Defendant Local 798 to change the way it discriminates.

22.     In 2017, Defendant Local 798's Business Manager Danny Hendrix was interviewed by NPR. In response to a comment about how the Local Union's entire leadership team was all white men, Hendrix replied: "The cream always comes to the top[.]"

23.     To this day, Defendant Local 798's leadership remains made up of exclusively White or White-passing men.[2]

**B.  *Local 798 Members Work at Michel's Pursuit to a Contract***

24.     Local 798 and Michel's are both signatories to the National Pipeline Agreement ("NPA").

25.     The National Pipeline Agreement is an agreement between the Pipe Line Contractors Association ("PLCA") and its contractor members and other mainline pipe line contractors and the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO.

26.     Micheals is a contractor member of the PLCA and/or other pipeline contractor as defined by the NPA.

---

[2] *See* Local 798 Elected Officers, available at https://local798.org/electedofficers/ (last accessed Jan. 4, 2023); Business Agents, available at https://local798.org/business-agents/ (last accessed Jan. 4, 2023).

27.     Local 798 is a member of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO as defined by the NPA.

28.     One purpose of the NPA is to stabilize employment in the Mainline Pipe Line Industry and to agree upon wage rates, hours, and conditions of employment for all employees performing work under the NPA.

29.     Plaintiff and the other Class members are Union members and employees of Michel's under the NPA.

30.     Pursuant to the NPA both Michels and Local 798 agreed that neither of them would take action or refuse to take any action which discriminates against anyone in regard to the terms, conditions, and privileges of employment due to race, age, color, sex, religion, national origin or disability.

31.     The NPA requires that Williams be a member of the Union.

32.     Michels Pipeline Inc and the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO Local 798 also enter into agreements governing work performed at Michels Pipeline sites for Local 798 members.

33.     These agreements incorporate the terms of the  NPA including the obligation not to engage in discriminatory acts.

34.     Pursuant to the agreement between Michels and Local 798, Journeymen earn more than double what the Helpers earn.

35.     Pursuant to the agreement between Michels and Local 798, even though Michels is the Employer, Local 798 is responsible for administering and resolving the grievances of employees like Williams for grievances which occur on the job, this includes resolution of grievances and complaints about racial discrimination and hostile work environment on the job site.

36.     The pattern and practice of ongoing discrimination and hostile work environment at the Local 798 and Michel's work sites across the country was such that members know that filing a grievance is futile because white members who observe the discriminatory conduct will not testify on their behalf, complaining members face even more severe consequences and harassment, and when complaints are lodged no action is taken.

37.     Michel's claims that they have a policy to provide equal employment opportunity free of discrimination against any individual on the basis of their race (including hairstyle or texture), creed, color, religion, sex (including pregnancy, childbirth, and related medical conditions), age, national origin/ancestry, disability, military and veteran status, sexual orientation, gender identity or expression, marital status, familial status, genetic information, work-related injury, arrest and conviction record, use of public assistance, local human rights commission activity, work authorization status, or any other characteristic protected by federal, state or local law.

38.     Michel's policy also allegedly applies to the selection and treatment of independent contractors, personnel working on our premises who are employed by temporary agencies and any other persons or firms doing business for or with Michels.

39.     However, Michel's fails to enforce this policy in regard to the protection of Black Helpers who are members of Local 798 on its work sites.

40.     Local 798 is subject to the constitution of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO ("UA Constitution").

41.     Section 198 of the UA Constitution prohibits discrimination on the basis of race, color, national origin and other protected classes.

42.     Section 198 of the UA Constitution provides that every member is entitled to just treatment and embraces all anti-discrimination laws of the United States.

43.     Local 798 does not enforce the just treatment of Black workers or embrace all anti-discrimination laws of the United States regarding the protection of black workers.

**C.   *Local 798 Discriminates Against Plaintiff and the Other Class Members in Terms of Advancement Opportunities***

44.     As part of its new mode of discrimination, Local 798 has imposed job advancement requirements that it designed as a glass ceiling so that Black union members, including Plaintiff and the other Class members, will not be able to advance and further does not hold White union members to those same standards prior to advancing them up the ranks.

45.     Local 798's union members are generally classified into two positions – "Helper" or "Journeyman."

46.     Journeymen are highly regarded and highly compensated skilled laborers who work on pipelines.

47.     Journeyman means persons seeking employment as Welders, spacers, stabbers, persons carrying the line in pipe line construction, testing Journeyman, technicians, mechanics, and end facers.

48.     Helpers are a less highly regarded and are compensated at a lower rate than Journeyman.  In fact, Helpers typically earn about half of what Journeymen earn.

49.     Helpers are all persons seeking employment as helpers assigned to help Journeymen and Helpers assigned to assist on pipeline work.

50.     Defendant Local 798's Handbook advises its members of two paths to move from the position of Helper to Journeyman.

51.     The first path pertains to Journeyman Welder. To become a Journeyman Welder a union member must, among other things, complete the following:

      a.     Accrue 5,000 hours of Covered Employment;

      b.     Complete 3 years of experience in Covered Employment;

      c.     Obtain 5 letters of recommendation from a Welder or Journeyman Member of the union with whom they have worked directly;

      d.     Submit an application and be accepted into the Local 798 Training Center Downhill Welding School;

      e.     Complete the Local 798 Training Center Downhill Welding School, certification tests, and pay applicable fees.

52.     The second path pertains to Journeyman Spacer. To become a Journeyman Spacer a union member must, among other things, complete the following:

a.     Submit a request to advance or change classification from Helper to Journeyman;

b.     Obtain 5 letters of recommendation from Journeyman Welders or Journeyman Spacers who have witnessed the union member working as a Journeyman Spacer;

c.     Complete 3,000 Helper hours in the last 10 years;

d.     Complete 500 Journeyman hours in a "pipe gang" during the last 2 years that are recorded at Local 798's Office; and

e.     Receive approval to change classifications from Local 798's Business Manager and Financial Secretary-Treasurer.

53.     While these requirements may appear to be racially neutral, they are applied almost exclusively and disproportionately to the detriment of the Black members, including Plaintiff and the other Class members.

54.     Local 798 and its White members use the requirements as a pretext so that Black member cannot advance.  In order to have any hope of advancing, Black members, including Plaintiff and the other Class members, are dependent upon being given work hours and recommendation letters from Journeyman union members who, a few short years ago, actively rejected Black people from joining the union, let alone joining the journeyman ranks.

55.     It is not surprising that if there are any Black journeymen in Local 798, their numbers are nominal.

56.     Those that do exist in the Local 798 came into the Union as Journeymen and did not advance in the Union.

57.     In addition to intentionally imposing advancement requirements that minority Black members would find exceedingly difficult to meet, through no fault of their own, Local 798 loosens or circumvents these requirements for White union members, further helping the "cream" rise to the top.

58.     White union members with less experience and seniority than Black union members, or even no seniority, have been allowed to join Defendant Local 798 and promptly become Journeymen.

59.     While similarly situated Black union members are never given this opportunity to promptly become Journeymen.

60.     As a result of the foregoing, Black members are relegated to permanent second-class status in Defendant Local 798.

61.     Because Black union members, including Plaintiff and the other Class members, are effectively barred from Journeyman positions, their lifetime earnings in this industry are hundreds of thousands of dollars less than White Journeymen.

**D.  *Plaintiff's Employment at Michel's as A Local 798 Member***

62.     Plaintiff, a member of the Local 798 labor union, was hired as a welder's helper at the Michel's Pipeline worksite in Wilkes-Barre, Pennsylvania, on April 28, 2023.

63.     This is not the first time Plaintiff has worked at a Michel's worksite.

64.     Plaintiff has experienced the treatment described herein at every worksite he had been as a Member of Local 798.

65.     Plaintiff worked at the Michel's worksite pursuant to the Agreement Between Michel's and Local 798.

66.     Within two weeks of working as a helper at the Michel's worksite, Plaintiff began to experience a racially hostile environment, highlighted by severe and pervasive harassment that changed the terms and conditions of his employment.

67.     From that point on, on a daily or near-daily basis, Plaintiff incrementally experienced verbal, written, symbolic, and overt racial discrimination from his coworkers and superiors that worsened over time including but not limited to:

   a.  Being sexualized and stereotyped constantly by Daniel Parmateer and Kevin Woods because of his race through the repeated, unwanted reference and jokes about his "big black cock."

   b.  Being taunted by Daniel Parmateer and Kevin Woods, with derogatory pictures of malnourished and impoverished African children and families that were distributed and compared to the resemblance to Plaintiff's family.

   c.  Being compared to and called apes and monkeys, through the display and dissemination of photos and the comparison of Plaintiff's facial features by Kevin Woods and Daniel Parmateer.

13

d.  Being subjected to "jokes" about watermelon, Moon Pies, fried chicken and chittlins during lunch breaks.

e.  Being called "Boy" regularly and repeatedly despite being asked to be called by his name.

f.  Being called "Nigger," which was also generically used to refer to all Black people.

g.  Having White coworkers, including but not limited to Kevin Woods and Daniel Parmateer, speak in a louder than usual tone saying the word "Niggers" when Plaintiff was seen approaching.

h.  Being directly called a "Nigger" by white coworkers and supervisors, including but not limited to Kevin Woods and Daniel Parmateer, even after asking that they did not call him that.

i.  Subjected to nooses at the worksite.

j.  Being threatened by Daniel Parmateer with a story of the murder of a Black welder's helper who was also a Local 798 member being  made to look like a suicide.

68.     Black union members at the worksite were in the minority of people at the worksite and White workers were a significant majority. The sheer number of racially discriminatory acts by the White workers far outnumbered the amount of Black Workers that were actually at these sites, but the White workers felt like welding was the last frontier

for White worker's monopoly of an industry.  The White workers were visibly offended by Plaintiff's presence because of his race, and they let him know about it.

69.     On most worksites Williams was the only Black Union Member.

70.     Because of the nature of the responsibilities of a welder's helper, and their support of welder or journeyman, welder's Helpers roles are discretionary and based off of the preferences of each welder and how the helper would interact with them.

71.     White Welders make it known to the Black Helpers that they control whether the Helper will stay employed on the job site.

72.     The Black Helpers are dependent upon the whims and abuse of the White Welders and Journeymen to keep their jobs.

73.     Basic preparation and cleanup of the worksite is fairly straight forward, yet Plaintiff's supervisor Daniel Palmateer still found a way to criticize his work ethic at every turn. The only constraints to sufficiently completing the work were that welders need their materials accessible and the work needs to be done in a timely manner.

74.     White Helpers received help from the laborers or the welders that they supported with preparation and cleanup of the worksite and would normally move faster and more efficiently with the more people helping them. Plaintiff, like other Black Welder's Helpers were not afforded help doing his job while White Helpers were routinely given assistance completing their jobs. This preferential treatment allowed for White workers to get jobs done faster while Plaintiff had to fend for himself.

75.     White Helpers would also not make an effort to assist Black Helpers.

76.     In addition to being able to have help completing their assignments White Helpers got preferential treatment compared to Plaintiff and other Black Helpers in several significant ways:

77.     Preferential notification of jobs so that they could bid on job opportunities first.

78.     White Helpers would be awarded jobs, even when Black Helpers' bids were more competitive.

79.     Lay-Off procedures were applied in a racially discriminatory manner where Plaintiff and other highly experienced and highly qualified Black Helpers were laid-off first, while less experienced and less qualified White Helpers kept their jobs.

80.     Rather than having neutral methods of ensuring fairness in the layoff and/or rehire process such as rehire correlating with time off work, White Helpers were rehired before Plaintiff and other Black Helpers who were more qualified.

81.     White workers with less experience than Plaintiff and other Black workers were selected to go to locations with higher pay scales.

82.     White Helpers were allowed to reach the threshold for full-time hours in a given year, while Plaintiff and other Black Helpers were often discriminatorily stopped just shy of the threshold for full-time hours which, effectively prevented the Black Helpers promotion to Welder or Journeyman.

83.     White Helpers with less than 5 years of experience were allowed to obtain Isolated Journeyman books for jobs that Black Helpers such as Plaintiff with more than 5

years of experience were routinely and repeated denied opportunities to obtain Isolated Journeyman books

84.     White Helpers were also routinely paid overtime, under the table in cash, while Black Workers such as Plaintiff were told that overtime was not available to Helpers.

85.     The following are specific example of the discrimination Plaintiff faced. However, as noted above, he faced discrimination every day that he worked at the Michels worksite through the union.

     a.  On or around May 11, 2023, Daniel Palmateer began screaming at Plaintiff and said "Boy you do what the fuck I tell you, when I tell you. I'll fucking show you hood boy, you think you fucking tough? I'll whoop your ass right now. Let's fucking go mother fucker." Plaintiff did not know what the problem was, he just stayed quiet and did not respond so that he could keep his job.

     b.  On or around May 19, 2023 in a conversation between Plaintiff and Daniel Palmateer, Palmateer said, "You know you remind me of that other Black boy I was working with, his name is Courtney. He ain't worth a shit, I got his ass ran off the other job I was on." Palmateer further stated that Courtney was "going back to the trap." Palmateer then said to Plaintiff, "you gonna be just like Courtney you not staying here for too long so back to the trap you go" and laughed at Plaintiff who then

asked, "Why do you make me feel like you got a problem with Black people?" Palmateer replied, "I do if you ain't worth a shit, you should be killed" he replied "I think all of them should be killed, get rid of all those mother fuckers."

c.  On or around May 27, 2023, Daniel Palmateer, Carty Williams, Kyle Wood, and Plaintiff were working on the monkey cage, welding bars that attached the cage to the ladder, when Plaintiff asked if he could weld on the monkey cage.  Palmateer told Plaintiff that couldn't weld and Plaintiff responded that "Kyle is welding he's a helper I can do everything he can do, we was just welding on junk pipe together and we both basically weld the same." Daniel then said, "I'm sorry bud, you're never gonna be a welder" then laughed and walked away. Carty Williams heard the exchange and said "Let Tareck weld this," then Daniel let Plaintiff weld on the monkey cage with Kyle Wood. The rest of the day Daniel addressed Plaintiff as "boy."

d.  On or around May 31, 2023, Daniel Palmateer and Plaintiff had a conversation where Palmateer said that he might leave this jobsite, and that he just got a contract hire job in West Virginia, and was considering going. Plaintiff replied, "West Virginia is far" and Palmateer said, "that's where I'm from. Have you ever worked out there?" Plaintiff replied that he had not, and

Palmateer said, "I bet you haven't … Black boys get killed in West Virginia every day."

e.  On or around June 6, 2023, Palmateer asked Plaintiff to go fishing with him after work and Plaintiff declined by telling Daniel that he doesn't feel comfortable going fishing with him. Palmateer replied, "What you think? Im gonna try to kill you? Come on *hang* out with me." After Plaintiff refused to join him, Palmateer was angry for the whole day and continued to address Plaintiff as "boy," and said degrading things about Plaintiff's work performance.

f.  On or around June 9, 2023, Plaintiff, Daniel Palmateer, Kyle Wood, and Carty Williams were working on Road Bore and Palmateer said "what the fuck are you doing"  and said "why the fuck you got that disgusted face on" he then said, "do you got a fucking problem boy" and got in Plaintiff's face trying to fight him and said, "I'll blow your ass up right now I fucking hate this Nigger, I'll whoop your fucking ass fix your fucking face right now or I'll beat your ass."

g.  On or around June 14, 2023, Palmateer made remarks to Plaintiff about Juneteenth, saying, "I don't understand why it's a fucking holiday that makes no fucking sense to me why the fuck do they need to make that a fucking holiday?"

h.  On or around June 27, 2023, Palmateer and Plaintiff were in the welding rig when Plaintiff asked Palmateer why he was constantly staring at him and Palmateer responded "Because you ain't worth a shit, you're a fuck up, Bud, I'm trying to help you out Boy" then laughed.

i.  On or around July 5, 2023, Plaintiff, Daniel, Carty, and Wood were working on Road Bore and Plaintiff forgot to ground the grass hopper and Daniel looked at him and said "Get the fucking ground, you're nothing but a fuck up, you're a damn train wreck, you don't do nothing right." Then Wood and Palmateer laughed at Plaintiff and made more racist jokes in his presence.

j.  On or around July 15 2023, Palmateer asked Plaintiff if he knew the firing line was getting laid off in 2 weeks. Daniel then told Plaintiff, "your black ass is getting laid off too, I'm surprised I lasted this long with you." As the day went on Wood and Palmateer exchanged pictures of monkeys, laughing and comparing Plaintiff's facial features with that of the monkeys and calling him "monkey."

k.  On or around July 27, 2023,  Palmateer again threatened Plaintiff, "I'll beat your fuckin ass if you get in this ditch. You ain't fucking helping me, you come in this ditch, I'll fucking

kill you. Get your shit out of my truck.  I hate that worthless piece of shit." Plaintiff reported this harassment and the threats by Palmateer to Union Steward Guy Simms and Foreman Lee Allen.    Both Simms and Allen laughed at Plaintiff's complaints. Shortly thereafter, Foreman Allen reassigned Plaintiff to the "pipe gang", a set of workers who were set to be laid off the next day. Plaintiff was then laid-off the next day on July 28, 2023.

86.     Neither the Union nor Michel's did anything to address the discrimination Plaintiff was experiencing.

87.     Plaintiff experienced the same king of discriminatory treatment on all prior job sites.

88.     On Plaintiffs first work site he experienced his co-workers miming his hanging.

89.     Plaintiff has been told that mouthy Black men disappear from work sites.

90.     Plaintiff is aware of Black Members dying at Local 798 worksites under unexplained circumstances.

91.     Plaintiff has been physically threatened by his co-workers at nearly every worksite without provocation and based upon his skin color.

92.     Other Local 798 members report experiencing the same threats and intimidation tactics when arriving on site.

93.     When Plaintiff has complained about the treatment he has been told "that's part of Union Membership" and "they're just trying to protect the white jobs" and that the Union is the last of the white jobs.

94.     Neither the Union nor Michel's have taken action to protect Plaintiff or to enforce the professed anti-discrimination policies allegedly adopted by them.

95.     Several times Local 798 refused to file a grievance relating to the discriminatory conduct on Plaintiff's behalf.  It only filed a grievance on his behalf after Plaintiff retained counsel.  Not surprisingly, the Union found no discrimination and told Plaintiff what he experienced was "just part of the job."

96.     The Union's anti-discrimination policy is lip service and is not enforced.

97.     The response of Simms and Allen were typical of Local 798 and Michels's response to complaints of racial discrimination.  Indeed, Plaintiff understood that neither his employer, nor his union, would do anything to stop what he was experiencing.  Thus, further complaints were futile.

98.     Like other Class members, Plaintiff was also unfairly deterred from advancing to Journeyman because of his race.  For example, when Plaintiff asked about welding school, one of the requirements for advancement, Local 798's business agent said he had never heard of that and there was no welding school.  This was clearly false and part of Local 798's efforts to disallow the advancement of Black members, creating a segregated and tiered workforce.

99.     Other times when Plaintiff sought the opportunity to go to welding school he was outright told "no you can't go."

100.     Plaintiff asked to go to a Local 798 Hall for welding training and he was told no.

101.     Throughout his time working with the Union, Plaintiff has been denied job opportunities that were given to White coworkers, and he has been terminated from job sites and not given job assignments that were made available to White coworkers.

102.     After losing his job with Michel's in July 2023 Plaintiff sought work with another Union.

103.     With the other Union, Plaintiff has been allowed to obtain welding training and and working with that Union to become a Welder.

104.     However, Plaintiff has sought welding training with Local 798 for years and has been repeatedly denied the opportunity for training even though white workers with the same or less experience and credentials were allowed to go to training and/or welding school.

105.     ***D. Racist Working Conditions at Other Michel's Locations***The discrimination that Plaintiff experienced is typical of that of the experience of the other Class members.   That is because the Union and Michel's allowed this type of discrimination at all Michel's worksites across the country, where Local 798 members, including the Class members, worked.

106.     This is evidenced by lawsuits filed around the country, which detail similar race discrimination.

107.     For example, the case of *Buggage v. Michels Corp., Pipeliners Local 978, and Enbridge Energy Co., Inc.,* No. 2:14-cv-00084-SPM (E.D. Mo.), details similar discrimination by the Union and Michel's at a worksite in Missouri.

108.     While working at the Michel's plant in Randolph County, Missouri, Union Business Agent Wallace, a White man, came to a Union meeting and told the members that the Union had been hit with sixteen lawsuits in the year 2014 alleging racial discrimination.

109.     The case *Rodney Jones, et al. v. Pipeliners Local 798*, No. 4:20-cv-00585-CRK-CDK (N.D. Okla.) details further similar allegations that have occurred involving Union members at other Michel's sites around the country.

110.     A statistical analysis of Journeyman versus Helpers, by race, will show that Black union members, including the Class members, do not advance fairly within the Union, including at Michel's worksites.

111.     Each Class member has experienced severe and pervasive racial harassment while working at Michel's worksites through the Union.

112.     Plaintiff experienced the same exact types of discrimination described herein while working for Michel's on other occasions, at other Michel's worksites.

113.     Other Union members have reported experiencing discriminatory conduct and terms and conditions of employment like Plaintiff at other Michel's locations.

114.     When those workers complained about the conduct to management for the Union and Michel's their complaints were ignored and or the members were told to ignore the discriminatory treatment and they were not protected or supported by Michels or Local 798.

## VI.   <u>CLASS ACTION ALLEGATIONS</u>

115.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and, in the alternative, 23(c)(4) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

116.     Plaintiff seeks to represent a class (the "Class") defined as:

All current and former Local 798 members who worked at any Michel's site, nationwide, pursuant to the Agreement between Michel's and Local 798 at any time during the relevant time period (the "Class").

117.     Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members. Plaintiff reserve the right to modify or amend the Class definitions, as appropriate, during the course of this litigation.

118.     This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

119.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The proposed Class are sufficiently numerous that individual joinder of all Class members is impracticable.  While Plaintiff is informed and believe that there are well over 50 Class members, the precise number of Class members is unknown to Plaintiff, but can be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

120.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2), 23(b)(3), and 23(c)(4).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will also materially advance the litigation. Common questions of fact and law affecting Class members include, without limitation:

a.  Whether Defendant imposed advancement requirements with the intent of stopping and/or discouraging Plaintiff and the class members from advancing to the position of Welder and Journeyman Spacer;

b.  Whether Defendant disparately applies the advancement requirements to the benefit of White Union members;

c.  Whether Defendant fails to enforce the Collective Bargaining Agreement ("CBA") because of the race of the Class members affected by violations of the CBA's non-discrimination provisions;

d.  Whether Defendant denies Plaintiff and the Class members the enjoyment of equal terms and conditions of employment because of their race;

e.  Whether Defendants subjected Plaintiff and the Class members to a hostile work environment because of their race;

f.  Whether Defendant's actions were intentional or willful;

g.  Whether Defendant's actions violate Section 1981 and/or Title VII;

h.  Whether Plaintiff and the class members are entitled to declaratory, equitable, or injunctive relief, damages and/or other relief; and

i.  The amount and nature of damages to be awarded to Plaintiff and the other class members.

121.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the other Class members were all similarly affected by Defendants' actions and inactions, and all worked for Michel's through the Union, at Michel's sites.  Plaintiff's claims are based upon the same legal theories as those of the other Class members.  Plaintiff and the other Class members sustained damages as a direct and proximate result of the same wrongful practices in which Defendants engaged.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

122.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiff is an adequate Class representative because their interests do not conflict with the interests of the other Class members who they seek to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one.  Plaintiff intends to prosecute this action vigorously.  The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

123.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Defendants have acted or refused to act on grounds that apply generally to Plaintiff and the other Class members, so that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

124.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for the Class members to individually seek redress for Defendants' wrongful conduct.  Further, individualized litigation would burden the Courts and create a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   <u>CLAIMS ALLEGED</u>

### <u>COUNT I</u>
### Section 1981 - Hostile Environment Harassment
### (Against Michel's and Local 798)

125.     Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

126.     Plaintiff is a Black man.

127.    Plaintiff was qualified for his position of employment with Local 798 and Michel's and performed his job satisfactorily in accordance with the responsibilities assigned to him.

128.    Plaintiff applied to work at the Michel's worksite pursuant to a contract with Local 798.

129.    While working at the Michel's worksite, Plaintiff was subjected to harassment on the basis of his race.  This included the incident where an Michel's employee verbally threatened and harassed the Plaintiff; Coworkers and Managers engaging in race-based stereotyping and "jokes" about the Plaintiff's facial features and monkeys; Plaintiff's job being threatened constantly by his supervisor; Plaintiff being subjected to inappropriate racial language and/or impoverished, malnourished African "jokes" in the workplace, including racist graffiti and racial slurs, all of which interfered with Plaintiff's employment and resulted in his racially discriminatory termination.

130.    The harassment was unwelcomed, severe, and pervasive.

131.    Michel's and Local 798 knew of the harassment because Plaintiff reported it to Michel's and Local 798, including through the union steward Guy Simms and Michel's Foreman Lee Allen on multiple occasions.  Further, the harassment was widely known and accepted by Michels' and Local 798 at Michel's worksites across the country.  The report of these incidents proved futile during each complaint, the steward and Foreman would laugh at Plaintiff, fail to address his complaints, and fail to escalate his concerns in order to properly address his complaints.

132.     Michel's and Local 798 failed to properly investigate Plaintiff's complaints and failed to take appropriate remedial action.

133.     The harassment affected a term, condition, or privilege of Plaintiff's employment.  For example, Plaintiff was not able to complete his work in an environment free from racial animus and the targeted attacks that were allowed to go on in the Local 798 labor union and on Michel's worksite unobstructed.

134.     The harassment complained of was routinely dismissed by Michel's and Local 798, who threatened and ultimately terminated the Plaintiff's employment after Daniel Parmateer's racist and harassing conduct.

135.     Plaintiff was wrongfully terminated by Michel's and Local 798, as a result of the racially hostile working environment.

136.     Plaintiff was denied advancement within the Union because of his race, through the administration of facially neutral terms, which were discriminatorily applied to the disadvantage of Plaintiff and the other Class members.

137.     As a direct and proximate result of Michel's and Local 798's unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of past and future income as well as compensation and benefits, for which he is entitled to an award of damages.

138.     As a direct and proximate result of Michel's and Local 798's unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited

to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of damages and other relief.

139.     Michel's and Local 798 acted with reckless indifference in committing their unlawful and discriminatory actions, which constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## <u>COUNT II</u>
### Title VII - Hostile Environment Harassment
### (Against Local 798)

140.     Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

141.     Plaintiff is a Black man.

142.     Plaintiff was qualified for his position of employment with Local 798 and Michel's and performed his job satisfactorily in accordance with the responsibilities assigned to him.

143.     Plaintiff applied to work at the Michel's worksite pursuant to a contract with Local 798.

144.     Defendants jointly employed Plaintiff while he worked at the worksite.

145.     Defendant Local 798 is liable under Title VII as Plaintiff's labor union.

146.     While working through the Union at the Michel's worksite, Plaintiff was subjected to harassment on the basis of his race.  This included the incident where an Michel's employee verbally threatened and harassed the Plaintiff; Coworkers and Managers engaging in race-based stereotyping and "jokes" about the Plaintiff's facial

features and monkeys; Plaintiff's job being threatened constantly by his supervisor; Plaintiff being subjected to inappropriate racial language and/or impoverished, malnourished African "jokes" in the workplace, including racist graffiti and racial slurs, all of which interfered with Plaintiff's employment and resulted in his racially discriminatory termination.

147.     The harassment was unwelcomed, severe, and pervasive.

148.     Local 798 knew of the harassment because Plaintiff reported it to Michel's and Local 798, including through the Local 798's Union Steward Guy Simms and Michel's Foreman Lee Allen on multiple occasions. The report of these incidents proved futile during each complaint, the steward and Foreman would laugh at Plaintiff, fail to address his complaints, and fail to escalate his concerns in order to properly address his complaints. Further, the racism and harassment was generally known by the Union at all of its sites.

149.     Local 798 failed to properly investigate Plaintiff's complaints and failed to take appropriate remedial action.

150.     The harassment affected a term, condition, or privilege of Plaintiff's employment.  For example, Plaintiff was not able to complete his work in an environment free from racial animus and the targeted attacks that were allowed to go on in the Local 798 labor union and on Michel's worksite unobstructed.

151.     The harassment complained of was routinely dismissed by Michel's and Local 798, who threatened and ultimately terminated the Plaintiff's employment after Daniel Parmateer's racist and harassing conduct.

152.     Plaintiff was wrongfully terminated by Michel's and was allowed by Local 798, as a result of the racially hostile working environment.

153.     As a direct and proximate result of Local 798's unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of past and future income as well as compensation and benefits, for which he is entitled to an award of damages.

154.     As a direct and proximate result of Local 798's unlawful discriminatory conduct and harassment in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of damages and other relief.

155.     Local 798 acted with reckless indifference in committing their unlawful and discriminatory actions, which constitute malicious, willful, and wanton violations of Title VII and Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**COUNT III**
**Section 1981 - Disparate Treatment**
**(Against Michel's and Local 798)**

156.     Plaintiff hereby incorporates by reference all previous paragraphs of this complaint as if fully set forth herein.

157.     Plaintiff is a "person" for purposes of 42 U.S.C. § 1981 and, at all relevant times herein, Michel's and Local 798 were Plaintiff's joint employers.

158.     Plaintiff is a Black man.

159.     Local 798 contracted and collaborated with Michel's for Plaintiff to work at Michel's. Plaintiff was qualified for his position of employment with Michel's and performed his job satisfactorily and in accordance with the duties given to him by Michel's.

160.     Michel's and Local 798 discriminated against Plaintiff on the "but-for" basis and because of his race in violation of Section 1981 by denying him the same terms and conditions of employment available to other employees who are not members of his protected class, subjecting him to disparate treatment and/or a hostile work environment, including, but not limited to:

      a.    Subjecting him to disparate working conditions;

      b.    denying him terms and conditions of employment equal to that of his co-workers who do not belong to the same protected category;

      c.    paying him less than his comparable and similarly situated colleagues in sufficiently similar and/or equivalent positions;

      d.    failing to hire and/or promote him to an appropriate job level based upon his qualifications and experience;

      e.    denying him the opportunity to work in an employment setting free of unlawful discrimination and harassment;

f.    failing to adequately investigate and identify discriminatory and harassing conduct in the workplace such that he can be free of a hostile work environment;

g.    failing to allow him promotional opportunities; and

h.    wrongfully terminating him.

161.    Michel's and Local 798 has discriminated against Plaintiff on the basis of his race in violation of Section 1981 by fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or remedy a disparate treatment and/or a hostile work environment that has included, among other things, unwelcomed, severe and pervasive discrimination due to and directed at his protected status.

162.    Despite having knowledge of Michel's pervasive discriminatory conduct, Local 798 failed to properly investigate or take appropriate remedial action, on information and belief, in part because it did not want to lose its contract with Michel's.

163.    As a direct and proximate result of Local 798's failure to investigate or remedy Michel's unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of past and future income as well as compensation and benefits, for which he is entitled to an award of damages.

164.    As a direct and proximate result of Michel's failure to investigate or remedy its own employees unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety,

35

loss of self-esteem and self-confidence, and emotional pain and suffering, for which he is entitled to an award of damages and other relief.

165.     Local 798 and Michel's acted with reckless indifference in committing its unlawful and discriminatory actions, constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## COUNT IV
### Title VII - Disparate Treatment (Against 798)

166.     Plaintiff hereby incorporates by reference all previous paragraphs of this complaint as if fully set forth herein.

167.     Plaintiff is Black.

168.     While working on job sites governed by Local 798's collective bargaining agreements, Plaintiff, and other members similarly situated to him, has been subjected to severe, pervasive, and objectively racist conduct.

169.     Local 798's Union Stewards on these job sites knew or should have known of the racist conduct affecting Plaintiff because Plaintiff told Steward Guy Simms about the harassment.

170.     Nonetheless, Local 798's Union Stewards consistently failed to enforce the terms of the collective bargaining agreements to stem this racist conduct.

171.     Local 798's failure to enforce the anti-discrimination clause of the Collective Bargaining Agreement disparately impacted Plaintiff and members of a protected class based on race.

172.     As a direct and proximate result of Defendant Local 798's conduct and failure to enforce, Plaintiff, and other members similarly situated to him, have suffered through untenable racist conduct on worksites governed by the collective bargaining agreement and denied the benefits of that Agreement.

173.     As a direct and proximate result of Defendant Local 798's conduct and failure to enforce, Plaintiff, and other members similarly situated to him, have suffered economic and non-economic injuries including pain, suffering, and emotional distress.

174.     As a direct and proximate result of Defendant Local 798's conduct and failure to enforce, Plaintiff, and other members similarly situated to him, are entitled to all available damages pursuant to Title VII, 42 USC § 2000e.

175.     Defendant Local 798's actions were willful, wanton, malicious, and in gross disregard of Plaintiff's, and other members similarly situated to him, rights entitling Plaintiff and the putative class members to punitive damages.

## <u>COUNT V</u>
### Title VII - Disparate Impact (Against 798)

176.     Plaintiff hereby incorporates by reference all previous paragraphs of this complaint as if fully set forth herein.

177.     Local 798 has instituted requirements necessary for union members to advance from the role of Helper to Journeyman Welder and Journeyman Spacer.

178.     Plaintiff is Black.

179.     Local 798 included advancement requirements in its Collective Bargaining Agreement that have made advancement more difficult or generally unobtainable for black

union members. Such requirements included the need to obtain at least 5 letters of recommendation for supervisory union members and (to become a Journeyman Spacer) the need to obtain a set amount of hours that could only be assigned by supervisory workers.

180. Plaintiff and other Class members sequentially met all qualifications for advancement to both Journeyman Welder and Journeyman Spacer, but for obtaining 5 letters of recommendation and the set amount of required hours.

181. Plaintiff was deterred from attending welding school.

182. Plaintiff diligently attempted to collect the requisite number of letters of recommendation and hours.

183. Plaintiff sent up to 10 requests for letters of recommendation. To his knowledge, none of them were completed.

184. Plaintiff routinely requested requisite hours to advance to Journeyman Spacer. He was routinely denied.

185. Despite Plaintiff's difficulties, Plaintiff observed white union members with less experience and seniority obtain the requisite recommendations and hours needed to advance with little difficulty.

186. Furthermore, Plaintiff observed white union members with less experience and seniority move to Journeyman status without being required to meet the advancement requirements he was being held to.

187. Accordingly, Local 798 treated Plaintiff, and other members similarly situated to him, less favorably than similarly-situated Caucasian members of Defendant Local 798 because of his race.

188.     As a direct and proximate result of Defendant Local 798's conduct in bargaining and application of requirements under its Collective Bargaining Agreement, Plaintiff, and other members similarly situated to him, has been denied the ability to advance to the position of Journeyman.

189.     As a direct and proximate result of Defendant Local 798's conduct in bargaining and application of requirements under its Collective Bargaining Agreement, Plaintiff, and other members similarly situated to him, has suffered economic injuries in the form of lost/diminished wages.

190.     As a direct and proximate result of Defendant Local 798's conduct in bargaining and application of requirements under its Collective Bargaining Agreement, Plaintiff, and other members similarly situated to him, has suffered non-economic injuries in the form of emotional pain and suffering.

191.     As a direct and proximate result of Defendant Local 798's conduct in bargaining and application of requirements under its Collective Bargaining Agreement, Plaintiff, and other members similarly situated to him, is entitled to all available damages pursuant to Title VII,  42 USC § 2000e.

192.     Defendant Local 798's actions were willful, wanton, malicious, and in gross disregard of Plaintiff's, and other members similarly situated to him, rights entitling Plaintiff and the putative class members to punitive damages.

## VIII.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a.   Enter an Order certifying the above-defined Classes and designating Plaintiff as Class Representatives, and Plaintiff' counsel as Class Counsel;

b.   Award all monetary relief to which Plaintiff and the other Class members are entitled, including as set forth in Counts I-V, above in an amount equal to $10,000,000 or other such relief that the Court deems just and equitable;

c.   Award pre- and post-judgment interest;

d.   Award reasonable attorneys' fees and costs to Plaintiff's counsel; and

e.   Grant such further and other relief as this Court deems appropriate.

## IX.   <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury on all causes of action so triable.


Dated:  January 2, 2024

Respectfully submitted,

s/ Ronald S. Pollock_____
Ronald S. Pollock
Fighting for People Injury Law
Pollack Law, LLC
210 E. Street Road
Suite 3A
Feasterville, PA  19053

Office: 215-396-9660
Fax: 215-396-9690
Email: ron@fightingforpeople.com